SALT LAKE CITY v. SMITH et al.

(Circuit Court of Appeals, Eighth Circuit. October 15, 1900.)

No. 1.365.

1. CONSTRUCTION OF CONTRACTS.
   The great desideratum and the real end to be attained by the construction of a contract is to ascertain the terms upon which the minds of the parties met, and the sense in which they were used when the parties made the agreement.

2. SAME—SITUATION OF PARTIES—SUBJECT-MATTER—MATERIAL.
   The situation of the parties when their contract was made, its subject-matter, and the purpose of its execution, are material, to determine the intention of the parties and the meaning of the terms they used; and, when these are ascertained, they must prevail over the dry words of the stipulations.

3. SAME—LIMITATION OF STIPULATION—EXTRA WORK—INTENT OF PARTIES.
   The stipulation, common to corporation agreements for work and labor, that contractors may be required to perform extra work connected with that described in the contract, at the price named in the agreement or fixed by an engineer, is limited, by the subject-matter of the contract and the intention of the parties, to such proportionally small amounts of extra work as may become necessary to the completion of the undertaking con-

templated by the parties when the contract was made; and work which does not fall within this limitation is new and different work, not covered by the agreement, and for which contractors may recover upon a quantum meruit.

4. SAME—STIPULATION AS TO ALTERATIONS. ·

The provision in such a contract that the corporation or its engineer may make any necessary or desirable alterations in the work, and that the contractors shall receive the contract price, or a price fixed by the engineer, for work or material required by the alterations, is limited, by the subject-matter and the intention of the parties when it was made, to such modifications of the work contemplated at the time of the making of the contract as do not radically change the nature or cost of the work or materials required. For all other work and materials required by the alterations the contractors may recover the reasonable value, notwithstanding the agreement.

5. SAME—STIPULATION FOR ARBITRATION—EFFECT.

The stipulation in such contracts that any questions, differences, or controversies which may arise between the corporation and the contractor under or in reference to the agreement and the specifications, or the performance or nonperformance of the work to which they relate, shall be referred to an arbiter, and that his decision thereof shall be final and conclusive upon both parties, gives the arbiter no jurisdiction to determine that work or materials which were not covered by the contract were furnished under it, and his decision to that effect is nugatory.

6. PLEADING—VARIANCE—MATERIALITY.

Where the ultimate facts which warrant a judgment for the plaintiff have been clearly alleged, and the issue thus tendered has been fairly tried, a variance between evidential facts pleaded and those proved, which has not misled or surprised the defendant, is not fatal to the judgment.

7. TESTIMONY AT FORMER TRIAL INADMISSIBLE.

The testimony which was given at a former trial by a witness who was presumptively within the jurisdiction of the court is hearsay and inadmissible under section 861 of the Revised Statutes and the general rules of evidence.

8. EXCEPTION TO EVIDENCE—WAIVER.

A single objection to a class of evidence when first offered, and an exception to an erroneous ruling admitting it, is sufficient, and neither the objection nor the exception is waived by a failure to constantly repeat them when subsequent offers of the same class of evidence are made.

9. EXCEPTION TO RULING—WAIVER.

One who objects and excepts to an erroneous ruling which permits his opponent to introduce improper evidence does not waive his objection or exception, or his right to a new trial on account of it, by his subsequent introduction of the same class of evidence in support of his case.

10. RIGHT TO EXAMINE WITNESS—WAIVER.

The right to call and examine a witness upon material issues in· a case is not waived or lost by reading his testimony at a former trial upon other questions in the case, in the absence of any order putting the party producing him to an election between his earlier testimony and his oral examination.

(Syllabus by the Court.)

In Error to· the Circuit Court of the United States for the District of Utah.

E. L. Dubois and. Joseph Williams made a contract with Salt Lake City on March 10, 1891, to furnish the materials and perform .the necessary work. except that required to make the excavations, to construct a covered conduit for the purpose of leading the waters of·Parley's creek from a point in Parley's cañon to Salt Lake City,—a distance of about six miles. After they had entered upon the performance ·of this undertaking. and before they completed it, they assigned their contract and their claim against the city to

Joseph H. Smith, G. G. Symes. H. A. W. Tabor, and J. W. Graham, who finished the work, and then sued the city for $97,007.61, which they alleged to be the reasonable value of extra materials and labor which they and their assignors had furnished to the city in the construction of the conduit under the direction of the city engineer. The city denied liability, and averred that these alleged extras constituted a part of the work which the contractors and their assigns were required to perform, and that they had received payment therefor at the prices fixed in the contract. The case has been tried three times. The last trial was before a jury, and it resulted in a judgment of $21,146.66 against the city, which now presents this writ of error for its reversal. Since the commencement of this action one of the original plaintiffs (G. G. Symes) has died, and Sophie S. Symes, his administratrix, has been substituted in his place. For the sake of brevity, those who have been and are seeking to enforce the claim against the city which has resulted in this judgment will be called the "plaintiffs," and Salt Lake City, the "defendant," in this statement and in the following opinion.

The plaintiffs alleged in their complaint: That the defendant advertised for bids for the construction of the conduit in accordance with maps and plans in the office of the city engineer. That Dubois & Williams examined these maps and plans, and the ground, upon the line laid out and staked by the city, which was such that it would require little or no stone masonry of any kind, no tunnels of any length, but an open trench, not to exceed six to eight feet in depth, over comparatively level ground throughout its entire length. That they made their bid with direct reference to constructing a conduit over the ground thus marked. That the instructions to bidders furnished by the city, and upon which the contractors relied, contained this provision and estimate: "For the purpose of arriving at the comparative value of the respective bids, the following quantities will be taken as approximating the actual quantities which the execution of the work will develop, and shall be used for no other purpose in connection with this contract. Approximate quantities: * * * Tunneling in earth, including timber, 10 cubic yards; tunneling in solid rock, 150 cubic yards; concrete masonry, 8,000 cubic yards; brick masonry, 2,500 cubic yards; cut-stone masonry, 10 cubic yards; rubble masonry, 10 cubic yards; rubble masonry laid dry, 10 cubic yards; riprap, 100 cubic yards; cement plaster, 40,000 square yards; lumber in the work per thousand feet, 10,000, board measure; cast-iron pipe, 36 inches, laid, 100 lineal feet; wrought-iron pipe, 36 inches, laid, 100 lineal feet; wooden pipe, 36 inches, laid, 100 lineal feet." That there was nothing in the maps, plans, or specifications that indicated that the bidders would be required to build any dam across Parley's creek, or to construct any wells or cisterns. That, in reliance upon these maps and plans, they prepared their bid and entered into their contract, and that in doing so they did not take into consideration the construction of any cut-stone culverts, or the lining of any tunnels with concrete masonry, or the laying of any pipes therein, or the building of any wells or cisterns or any dam across Parley's cañon, and that all this work was of a more expensive and of an entirely different kind, nature, and character from any work described in the specifications or instructions to bidders, or in the directions or instructions of the city engineer, and no such work would have been required if the conduit had been constructed over the ground where the line was staked out and surveyed. They averred that Dubois & Williams, in this state of the case, made the lowest bid, and entered into the contract to furnish the material and do all the work, except the excavation, for the construction of this conduit, and to accept and receive as compensation for the kinds of work they performed the following prices: Concrete masonry, per cubic yard, $5.97; brick masonry, per cubic yard, $8.85; cut-stone masonry, per cubic yard, $12.40; rubble masonry, per cubic yard, $7.50; rubble masonry, laid dry, per cubic yard, $5; riprap, per cubic yard, $3; cement plaster, per square yard, 34 cents; lumber used in the work, per 1,000 feet, board measure, $35; cast-iron pipe, 36 inches, laid, per lineal foot, $11.68; wrought-iron pipe, 36 inches, laid, per lineal foot, $6.95; wooden pipe, 36 inches, laid, per lineal foot, $3.45. They alleged that they commenced to construct the conduit at Salt Lake City, and

advanced with the work towards Parley's cañon; that, after they had constructed in the open trench over four miles thereof, the line or route of the conduit for the last mile was materially changed by the city engineer from comparatively level ground to a course over deep ravines and through hills, which required expensive tunnels, the lining of such tunnels at great expense with concrete masonry, the laying of heavy iron pipes therein, and the construction of large and expensive cut-stone culverts, which would not have been necessary if the line and plan of the work had not been changed; that they constructed the conduit in the place and manner directed by the engineer of the city; that, instead of furnishing 10 cubic yards of cut-stone masonry, they were required to and did build 865.44 cubic yards thereof; that, instead of 10 cubic yards of rubble masonry, they were required to and did build 134.63 cubic yards thereof; that the masonry so constructed was of an entirely different character, in a different location, and worth more than twice as much per cubic yard as the nominal quantity for which they bid, and which they agreed to construct; and that, because this work was of a different nature, character, and kind from that mentioned in the contract, it was not covered thereby, and they were entitled to recover the reasonable value thereof, which they alleged to be more than $25,000. They asserted that, by reason of the changes in the line and route over which the conduit was constructed, they were required to construct a concrete conduit through the tunnels; that this work was of a nature entirely different from that of constructing a conduit in an open trench; and that they were entitled to recover the reasonable value of this work, which they claimed to be more than $28,-000. They averred that they were required to construct and did build an expensive concrete and cut-stone dam to gather the waters of Parley's creek, which was not contemplated or mentioned in the plans, specifications, bid, or contract, and that the work and material furnished upon this dam were worth more than $26,000. For these and other similar items of materials and labor they asked to recover the $97,007.61 for which the suit was brought. The answer of the defendant was that the line or route of the conduit for the mile for which the tunnels, cut-stone masonry, rubble masonry, and dam were required had not been located or surveyed when the bids and the contract were made; that Dubois & Williams made their bid and contract with knowledge of this fact; that most of the work and material for which they claimed to recover reasonable compensation in their complaint was of the same kind and character as that specified in the contract; that its price was fixed thereby; that the plaintiffs had been paid this price; that, wherever any extra-material or work had been required, Dubois & Williams had, by their contract, empowered the engineer of the city to determine its price; that he had done so; and that they had been paid this price, so that there was no liability upon the city on account of any of the matters set forth in the complaint.

The testimony of the witnesses of the respective parties to this action generally supported the averments of their pleadings. Upon the questions whether or not a line for the masonry conduit had been surveyed and staked out over the last mile of the course before the bids were received and the contract was made, and whether or not the concrete masonry in the tunnels and the cut-stone and rubble masonry in the culverts and dam were of the same nature and character as those specified in the approximate estimate of the engineer and in the contract, and upon the question of the reasonable value of this work and material, the testimony of the parties is in hopeless conflict. Out of the mass of conflicting evidence, however, a few salient facts stand forth, established beyond peradventure. One of them is that the line where this conduit was subsequently actually constructed over the mile in dispute was neither staked nor marked upon the ground, nor shown upon any map or plan exhibited to the bidders, before the contract was made. This portion of the line had either never been surveyed and located at all, or it had been surveyed and located on another and different line, from which it was changed to the line of construction after the execution of the contract. Another fact is that while the city engineer's approximate estimate of the amount of cut-stone masonry to be furnished by the contractors when they made their bid was 10 cubic yards, the amount which they were actually

required to furnish was, according to his testimony, 535.7 cubic yards, and, according to the testimony of some of the witnesses of the plaintiffs, 865.44 cubic yards; that, while the amount of rubble masonry which he estimated would be required before the bids were made was 10 cubic yards, the amount which the plaintiffs were required to and did furnish was, according to his testimony, 308.7 cubic yards, and, according to the testimony of some of the witnesses for the plaintiffs, 154.07 cubic yards: and that, while the amount of iron pipe which he estimated would be required was 200 lineal feet, the amount which the plaintiffs were required to furnish and did furnish was more than 1,800 lineal feet. The contract price for the cut-stone masonry was $12.40 per cubic yard. The testimony of the witnesses for the plaintiffs was that the cut-stone masonry constructed by the plaintiffs was reasonably worth from $25 to $50 a cubic yard. The contract price for the concrete masonry was $5.97 per cubic yard. The testimony of some of the witnesses for the plaintiffs was that, while this was a fair price for concrete masonry placed in a trench 6 or 8 feet deep, it was not the reasonable value of masonry placed in tunnels, or of that placed in the dam, and that the reasonable value of this masonry, which amounted to about 2,000 cubic yards, was from $12 to $20 per cubic yard. All this testimony was contradicted by the testimony of the witnesses for the defendant, and the questions were submitted to the jury under the instructions of the court. But the main defense of the city was that most of this work was of the same character as that specified in the contract; that the contract price covered it: that under the contract the city engineer had authority to order extra work and materials, and to fix the price thereof: that he had the right to determine what portion of the work and materials required was governed by the contract, and what was not; that he had determined all these questions; and that the prices he had fixed had been paid. This defense was based on the following provisions of the specifications, the instructions to bidders, and the contract. The specifications provided: "All concrete masonry will be paid for by the cubic yard, at the price named in the contract, and will be measured after having been laid, only. * * * Brick masonry will be paid for by the cubic yard, at the price named in the contract. All stone masonry will be paid for by the cubic yard, at the price named in the contract." There were other similar provisions regarding all the other materials used in the work. The instructions to bidders contained the provision with reference to approximate quantities which has already been quoted, and these sections: "(2) The conduit will be constructed of masonry, and will be circular in form, built to a uniform grade line, and at such depth below the surface as will insure it against the effects of frosts. Manholes will be constructed at intervals of 1,000 feet along the conduit, to serve the purpose of repairs, and for ventilation." "(20) Any controversy or difference of opinion that shall arise regarding the true intent or meaning of any part of the specifications shall be referred to the city engineer, and his decision shall be final and binding on all parties." The contract contained the usual provision that the contractors would do the work, and that they would accept and receive as full compensation for the respective kinds of work named the prices already cited, and the following provisions: "(5) The work shall be done in strict conformity with the attached specifications, and with such lines, levels, stakes, maps, and drawings, and with such verbal instructions, as shall from time to time be given by the city engineer or any authorized inspector for the guidance and direction of the contractor." "(7) The contractor shall do such extra work in connection with the work herein contracted to be done as the city engineer and board of public works may direct, and, if it shall be of a nature for which no price is stated in this contract, then the price therefor shall be fixed by the city engineer. But no allowance for extra work of any kind will be made, unless ordered in writing, and signed by the city engineer and the board of public works." "(15) The city shall have the right to make any alterations that may hereafter be determined upon as necessary or desirable, either before or after the commencement of the work, by defining them in writing, and, in case such alterations increase the quantities, the contractor shall be paid for such excess at the contract rates herein specified; but, should such alterations diminish the quantity or extent of the work to be done, it shall not

under any circumstances be construed as constituting. and shall not constitute, a claim for damages, nor shall any claim be made on account of anticipated profits on the work that may be altered or dispensed with." "(22) Any questions, differences, or controversies which may arise between the city and the contractor under or in reference to this agreement and the specifications, or the performance or nonperformance of the work to which they relate, shall be referred to the city engineer, and his decision shall be final and conclusive to both parties." The legal effect of these various written stipulations. and the sufficiency of the defense of the city based upon them, under the facts of this case, were presented to the court below; and its rulings upon them were challenged again and again by objections and exceptions to the introduction of evidence of the character and reasonable value of the extra materials and work, by requests for instructions to the jury. and by exceptions to the charge, and these and other questions which will be considered in the opinion are presented by the assignment of errors.

Charles S. Varian (Frank B. Stephens and Franklin S. Richards, on the brief), for plaintiff in error.

John W. Judd and Oscar Reuter, for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The purpose of a written contract is to evidence the terms on which the minds of the parties to it met when they made it, and the ascertainment of those terms, and the sense in which the parties to the agreement used them when they agreed to them, is the great desideratum and the true end of all contractual interpretation. The express terms of an agreement may not be abrogated, nullified, or modified by parol testimony; but, when their construction or extent is in question, the meaning of the terms upon which the minds of the parties met when they settled them and their intention in using them must be ascertained, and when ascertained they must prevail in the interpretation of the agreement, however broad or narrow the words in which they are expressed. In the discovery of this meaning, the intention, the situation of the parties, the facts and circumstances which surrounded and necessarily influenced them when they made their contract, the reasonableness of the respective claims under it, and, above all, the subject-matter of the agreement and the purpose of its execution, are always conducive to and often as essential and controlling in the true interpretation of the contract as the mere words of its various stipulations. These are rules for the construction of contracts which commend themselves to the reason and are established by repeated decisions of the courts, and they must not be permitted to escape attention in the consideration of the contract which this case presents. Accumulator Co. v. Dubuque St. Ry. Co., 64 Fed. 70, 74, 12 C. C. A. 37, 41, 42, 27 U. S. App. 364, 372.

The great question in this case is whether the work and materials for which the plaintiffs have brought this action fall within or without their contract with the city, and that must receive its answer from an interpretation of the agreement itself. The court below (83 Fed. 784) held that, if the materials and labor in question were of the kind and of the value stated by the plaintiffs' witnesses, they were not contemplated by the parties when they made their

agreement, and were not within and governed by the contract, and that the defendant was bound to pay their reasonable value. The defendant complains of this ruling in various ways, by numerous specifications of error, which it is unnecessary to quote. Its counsel insist that the contract specifies a price, or authorizes the city engineer to fix a price, for every item of materials and of labor contained in the plaintiffs' claim, and that the price of every item thereof must therefore be determined and governed by the contract itself, and not by the measure of its reasonable value. They contend that the contractors agreed to construct cut-stone masonry for $12.40 per cubic yard, and that although they did this in reliance upon the city engineer's approximate estimate that only 10 cubic yards, amounting in value to $124, would be required, yet the engineer had the right to ask them to construct 865.44 cubic yards of this masonry, which was reasonably worth $30 per cubic yard, or $25,963.20, at the contract price of $12.40 per yard, or for $10,-731.45. They argue that the parties gave the engineer this power under section 15 of this agreement, which authorizes him to make any necessary or desirable alterations in the work before or after its commencement, and to pay the contractors for increased quantities at the contract rates, and under sections 7 and 22 of the contract, which require the contractors to do such extra work connected with that covered by the contract as the city engineer and the board of public works shall direct, and authorize the former to fix the price which the contractors shall receive for all work and material of a different nature from that specified in the agreement. They say that under these provisions the city engineer was authorized to require the contractors to construct a dam to gather and hold the waters of Parley's creek, the concrete and cut-stone masonry in which cost more than twice the contract price per yard, and that the city was permitted to pay them in full therefor at such price as the engineer fixed, although no mention of this dam was made in the contract, or in the maps, plans, or specifications upon which the contractors made their bid; that the engineer had the right to demand that the contractors should place 2,000 cubic yards of concrete masonry in tunnels through hills and on embankments over ravines, upon a line that was never marked out before the agreement was made, for the contract price of $5.97 per cubic yard, although that was the price bid for placing such masonry in an open trench on comparatively level ground shown on the map and by the specifications, and the cost and value of placing it in such tunnels and on such embankments was from $12 to $20 per cubic yard; and that this contract authorized the engineer to require the contractors to construct 154.07 cubic yards of rubble masonry and to lay 1,800 lineal feet of iron pipe at the prices named therein, although their bid and agreement were based on an approximate estimate of the engineer that only 10 cubic yards of such masonry and only 200 feet of such iron pipe would be required to construct the conduit. Nor are these contentions without support in the terms of the contract. If, blind to reason, to the object of the agreement, to the situation and intention of the parties,

and to the undertaking they contemplated, we read the dry words of the contract and the specifications, it must be conceded that they are broad and comprehensive enough to sustain these arguments of the counsel for the city. They require the work done and the materials furnished to be paid for at the price specified in the agreement; they require the work to be done on such lines and levels and in accordance with such verbal instructions as the city engineer shall present; they authorize the engineer to make any necessary or desirable alterations in the work; they require the contractors to perform any extra work in connection with that specified in the contract that the engineer shall require them to do; they provide that increased quantities of work and materials furnished under these provisions, of the same nature as those specified in the contract, shall be paid for at the agreed price, and that those of a different nature shall be paid for at a price fixed by the engineer; and they make him the interpreter of the specifications, and the arbiter of all controversies which arise in reference to the contract and the work done under it. The engineer admits in his testimony that under these provisions of the agreement he required these contractors to furnish more than 53 times the estimated quantity of the most expensive work and materials specified in the contract,—the cut-stone masonry; and the witnesses of the plaintiffs testify that he required more than 86 times the estimated amount, and that the masonry thus called for was of such a character that it cost and was reasonably worth more than twice as much per cubic yard as that described in the contract, or, in the aggregate, more than 182 times the cost and value of the amount which the engineer estimated would be necessary for the undertaking before the bid was made. If he could lawfully so multiply the quantity, change the character, and increase the cost of the most expensive work named in the contract, it is difficult to perceive why he might not, under the same authority, increase the cost and quantity of every other item named in the agreement to the same extent, and in this way require the construction of a conduit from 53 to 182 times as costly as that contemplated by the parties when the agreement was made. It is conceded that the literal terms of the contract, when divorced from reason, from the object contemplated by the parties, from their situation, and from their intention, are so general and unlimited as to permit this to be done. But it is as clear as the sun at noon in a cloudless sky that the minds of these parties never met upon such a proposition, and that they never contemplated or intended to make any such contract. When they settled upon the terms of this agreement, they were considering a conduit laid in an open trench 6 or 8 feet deep, "at such depth below the surface as will insure it against the effects of frost," as the instructions to bidders read, over a comparatively level surface, requiring materials and work of about the quantities estimated by the engineer, and of a character necessary for the construction of such a work. This was the conduit described in the plans and specifications upon which the bid of the contractors and the contract itself were based, and this was the contract which the parties con-

templated, and upon which their minds met when they made their agreement. This plain fact limits every stipulation of the agreement, and in its light and in the light of reason every provision of this contract must be interpreted.

The stipulation that the contractor shall do such extra work in connection with that described in the agreement as the city engineer and the board of public works may direct is as effectually limited by this fact to such extra work of proportionally small amounts as was necessary to the construction of the contemplated conduit as it would have been if this restriction had been written in the agreement in so many words. A concrete and cut-stone dam to gather and hold the waters of Parley's creek, and wells or cisterns along the course of the conduit, were no more contemplated or covered by this provision of the contract than pipes and hydrants to distribute the water in the city. The stipulation that "the city shall have the right to make any alterations that may hereafter be determined upon as necessary or desirable," and that the contractors shall be paid for increased quantities at the contract prices, is subject to a like limitation. That provision, not unusual in agreements with cities and other corporations, is limited in its meaning and effect, by reason, and by the object of the contract, to such modifications of the contemplated work as do not radically change its nature and its cost. Little if any testimony is required to convince the thoughtful mind that the cut-stone masonry required to construct a small culvert over a ditch or a creek on a level prairie may be of a character and cost radically different from that necessary to build a stone arch upon sloping banks over a mountain stream, or a stone bridge over a great river like the Mississippi, or a stone building of large dimensions and great height. There was ample testimony in this case to warrant the jury in finding that the masonry required for the dam and the culverts which the plaintiffs constructed was not of the same nature or value as that contemplated by the parties when they made the contract. Nor was the evidence much less persuasive, nor is it more incredible, that the 2,000 cubic yards of concrete masonry which was placed in tunnels of small diameter, into which it was borne on wheelbarrows, and where it was placed by artificial light, was of a very different nature and cost from that placed in open trenches, only deep enough to escape the frost, as contemplated in the bids and the agreement. The testimony of the plaintiffs' witnesses was that the value of this work was from $12 to $20 per cubic yard, while the contract price for that contemplated by the parties when they made the agreement was only $5.97 per cubic yard. No such work as this was in the minds of the parties when they made this contract, nor could they have intended to authorize so radical an alteration of the nature of the work as to require it. Since they did not contemplate or intend to contract concerning it when they made their agreement, it was new and different work from that covered by their contract, and the plaintiffs were entitled to recover its reasonable value. Upon this question the court below held upon the trial, and finally charged the jury, in effect, that the city had

104 F.—30

no right to require the contractors to perform large quantities of work, radically different in its character, nature, and cost from that originally contemplated by the parties when they made their contract, and that, if it had required such work, the plaintiffs were entitled to recover its reasonable value. This was the theory upon which the case was tried, and it was the true theory. It is just to the city, fair to the contractors, and it accords with reason and established law. The dry words and broad stipulations of contracts must be read and interpreted in the light of reason and of the subject contemplated by the parties. The stipulation common to many corporation contracts, that contractors may be required to perform extra work at the price named in the agreement or fixed by an engineer, is limited by the subject-matter of the contract to such proportionally small amounts of extra work as may become necessary to the completion of the undertaking contemplated by the parties when the contract was made; and work which does not fall within this limitation is new and different from that covered by the agreement, and the contractor may recover the reasonable value thereof notwithstanding the contract. The customary provisions in such contracts that the corporation or its engineer may make any necessary or desirable alterations in the work, and that the contractors shall receive the contract price or a price fixed by the engineer for the work or materials required by the alteration, is limited in the same way, by the intention of the parties when the contract was made, to such modifications of the work described in the contract as do not radically change its nature or its cost. Material quantities of work required by such alteration, that are substantially variant in character and cost from that contemplated by the parties when they made their agreement, constitute new and different work, not governed by the agreement, for which the contractors may recover its reasonable value. Cook Co. v. Harms, 108 Ill. 151, 158, 159; Bridge Co. v. McGrath, 134 U. S. 260, 10 Sup. Ct. 730, 33 L. Ed. 934; City of Elgin v. Joslyn (Ill. Sup.) 26 N. E. 1090, 1092; Sexton v. City of Chicago, 107 Ill. 323, 330; Kirk v. Manufacturing Co., 118 Ill. 567, 8 N. E. 815; Railway Co. v. Vosburgh, 45 Ill. 311, 314; Railroad Co. v. Smith, 75 Ill. 496, 507. The stipulation in such contracts that all questions, differences, or controversies which may arise between the corporation and the contractor under or in reference to the agreement and the specifications, or the performance or nonperformance of the work to which they relate, shall be referred to the engineer, and his decision thereof shall be final and conclusive upon both parties, does not give the engineer jurisdiction to determine that work which is not done under the contract or specifications, and which is not governed by them, was performed under the agreement and is controlled by it, and his decision to that effect is not conclusive upon the parties. Neither an engineer nor a judge who has no jurisdiction of a question can confer jurisdiction of it upon himself by erroneously deciding that he has it.

It is assigned as error that the court below refused to instruct the jury that, if there was no change of the line of the conduit

over the mile in controversy after the bid was made, there could be no recovery in this action. The argument in support of this specification is that the only cause of action pleaded in the complaint is based upon this change of line, and that, consequently, if there was no change of line established, there could be no recovery. It is true that the plaintiffs alleged in their complaint that the line which had been surveyed and staked by the city for this conduit before the contractors made their bid was changed by the city after they made their contract, and that, if this change had not been made, the work and the materials for which they sued it would never have been required. Nevertheless the gist of the cause of action pleaded in the complaint was not the change of the line, but the requiring and furnishing of the work and materials in suit. This is plain from the fact that if the line had been changed there could have been no recovery unless the work and materials furnished had been radically different from those covered by the contract, while the new and different work and materials would have warranted a recovery although there had been no change of the line. Nor will a careful analysis and consideration of all the averments of the complaint show any variance between the cause of action for the reasonable value of this new and different work and materials and the cause set forth in the pleadings. Those averments clearly state the character and value of this work and of these materials, that they were required of the contractors by the city, that they were radically different from any specified in the agreement, and that the contractors and their assignees supplied them. These allegations were ample to warrant a recovery here, whether there was a change from the line staked by this city for this conduit, as the plaintiffs allege, or there never was any line marked out for it until after the contract was made, as the city claimed. There was only one cause of action stated in the complaint. That was for the work and materials not covered by the agreement, and it was for that cause that the verdict and the judgment were rendered. There was no error in the refusal of the court to charge that there could be no recovery in this action unless the line had been changed. Where the ultimate facts which warrant a judgment for the plaintiff have been clearly alleged in the complaint, and the issue thus tendered has been fairly tried upon the merits, a variance between the evidential facts set forth in the pleading and those established by the proof, which has not misled or surprised the defendant, is not fatal to the verdict or judgment. Burt v. Gotzian (C. C. A.) 102 Fed. 937.

There are other assignments of error relative to the rulings and charge of the court concerning the line of the conduit over the mile in controversy, but it is unnecessary to consider them here, because, if there was any error in these rulings, it was probably immaterial, and it is not likely to creep into any subsequent trial. The crucial question in this case is not whether the line was staked before and changed after the contract was made, or was not located at all until after the execution of the agreement, although this issue may be of some importance in its bearing upon the main question to be deter-

mined. The real questions are: Was any of the work or material for which the plaintiffs have brought this suit radically different in its cost and character from that contemplated by the parties when they made their agreement? If so, how much, and what was its reasonable value? These are questions of fact to be determined by the jury, under proper instructions from the court, if the case is again tried before a jury, and by the court or a referee if it is tried without a jury. The facts relative to these questions as they were presented at the last trial, and the law applicable to them, have been considered for the purpose of facilitating, if possible, a fair trial and a speedy and conclusive determination of this issue. Our views have undoubtedly been sufficiently expressed to accomplish that purpose, and we turn to another phase of this record.

This case had been twice tried before it came to the trial under consideration, and the testimony of the witnesses in each of these earlier trials had been preserved and filed with the court. The order granting the third trial contained this provision: "All testimony heretofore taken and filed in this cause shall be available to the parties, respectively, on such trial, subject to objection." When the plaintiffs commenced to read from the transcript of the testimony given at one of the former trials the evidence of their first witness, the defendant objected to it on the ground that this was a trial at law, and the witnesses, being within the jurisdiction of the court, should be introduced and sworn, and should testify orally before the jury, as though their testimony had not before been taken. The court overruled this objection, and held that the former testimony of the witnesses could be read as a deposition, and the defendant excepted. After the plaintiffs had read the former testimony of their witnesses and had rested their case in chief, and after the defendant had read the former testimony of A. F. Doremus and that of some other witnesses, and had introduced and examined several witnesses orally, it introduced Mr. Doremus as a witness, asked that he be sworn, and offered to prove by him the quantity, quality, and reasonable value of the materials and work that entered into the construction of the conduit on that portion of the line in controversy. The court refused to permit this witness to be sworn or to be examined, because his former evidence had been read, notwithstanding the fact that his former testimony did not relate to the points on which the city sought to examine him orally. These rulings are challenged as error. The acts of congress dispose of one question which these specifications present. They provide in chapter 17, Rev. St.:

"Sec. 861. The mode of proof, in the trial of actions at common law, shall be by oral testimony and examination of witnesses in open court, except as hereinafter provided."

"Sec. 863. The testimony of any witness may be taken in any civil cause depending in a district or circuit court, by deposition de bene esse, when the witness lives at a greater distance from the place of trial than one hundred miles, or is bound on a voyage to sea, or is about to go out of the United States, or out of the district in which the case is to be tried, and to a greater distance than one hundred miles from the place of trial, before the time of trial, or when he is ancient or infirm."

The remainder of this section and sections 864 and 865 are directory as to the officer before whom the deposition may be taken, the notice to the opposite party, and the manner of taking, testifying, and returning the deposition to the court.

"Sec. 866. In any case where it is necessary, in order to prevent a failure or delay of justice, any of the courts of the United States may grant a dedimus potestatem to take depositions according to common usage; and any circuit court, upon application to it as a court of equity, may, according to the usages of chancery, direct depositions to be taken in perpetuam rei memoriam, if they relate to any matters that may be cognizable in any court of the United States."

Section 867 authorizes the courts of the United States, in their discretion, and according to the practice in the state courts, to admit evidence so taken; and sections 868, 869, and 870 prescribe the manner of taking such depositions, and of the use of the subpœna duces tecum, and how it may be obtained.

These various sections of the acts of congress provide a complete system for the practice of the courts of the United States in the procurement and admission of the testimony of witnesses. In section 861 they establish a general rule, and in the subsequent sections to which reference has been made they specify every exception to it. Every case must, therefore, fall under the rule or under one of the exceptions. A glance at the sections which specify the exceptions discloses the fact that the testimony of a witness at a former trial is not among the exceptions, and this case therefore necessarily falls under the express declaration of congress that the mode of proof in actions at common law shall be by oral testimony, and examination of witnesses in open court. There was no proof or offer to prove that the plaintiffs' witnesses who testified at the former trial were dead, insane, without the jurisdiction of the court, or that for any reason their presence and oral examination were either impossible or impracticable. The legal presumption, therefore, was that their attendance could be obtained by the customary issue and service of a subpœna. It is not claimed that the acts of congress from which these provisions of the Revised Statutes are extracted were unconstitutional or ineffective. It is not within the province or the power of the judicial department of the government to repeal or to abrogate the provisions of these constitutional statutes, and it was error for the court below to admit in evidence the testimony of the witnesses for the plaintiffs taken at former trials. Ex parte Fisk, 113 U. S. 713, 722, 725, 5 Sup. Ct. 724, 28 L. Ed. 1117; Whitford v. Clark Co., 119 U. S. 522, 525, 7 Sup. Ct. 306, 30 L. Ed. 500; Beardsley v. Littell, Fed. Cas. No. 1,185. Counsel for the plaintiffs attempt to escape from the effect of this proposition in numerous ways. They insist that the counsel for the defendant waived their objection to the former testimony of the witnesses because they did not urge it when the order granting the third trial was made, nor until the testimony was offered in evidence. But a party does not waive his right to a trial of his action according to the express provisions of the acts of congress and the settled rules of evidence by failing to object to an order for a trial in violation of them until his

opponent attempts to take advantage of that order. He has a right to presume that the latter will proceed in accordance with the statutes and the law, and not in pursuance of an order which it was beyond the power of the court to make or to enforce. The city did not waive its right to a fair and lawful trial of its case by its failure to object to hearsay evidence until it was offered.

Another contention is that counsel for the city waived their objection, because, after it was offered, and after they had taken their exception, they permitted the testimony of other witnesses to be read without objection, and because in the proof of their defense they availed themselves of the same class of testimony. But the single objection which they made, and the single exception which they took, presented the entire question of the introduction of this hearsay testimony, and elicited a ruling of the court upon it which was conclusive and controlling at that trial of this case. There was no reason or call for further objections to evidence of this character, and their only effect would have been to annoy the court and to delay the trial. When a question has once been fairly presented to the trial court, argued, and decided, and an exception to the ruling has been recorded, it is neither desirable nor seemly for counsel to continually repeat their objections to the same class of testimony, and their exceptions to the same ruling which the court has advisedly made as a guide for the conduct of the trial. Counsel for the city lost nothing by their failure to annoy the court by repeating an objection which it had carefully considered and overruled. Nor did they waive this objection and exception by introducing in defense of the suit evidence of the same character as that to which they had objected, and which they had insisted was incompetent. They had presented their view of this question. They had objected to hearsay testimony, and had excepted to the ruling which admitted it. They had not invited the error of that ruling, but had protested against it. This was all that they could do. The plaintiffs had induced the court to commit the error, and were thereby prohibited from availing themselves of it in any court of review. Under this error they established their case by hearsay. Were counsel for the city required to refrain from meeting this proof by evidence of like character, under a penalty of a loss of their objection and exception? By no means. They had presented to the court and argued what they deemed to be the law. The court had held that they were mistaken. However firm they were in their conviction of the soundness of their position, the presumption was that they were in error; and it was the part of prudence and their duty to their client and the court to produce all the evidence which they could furnish in support of their demands, under the rule which the court announced, firmly but respectfully preserving their right to reverse the judgment if they failed to win their suit under the erroneous rule which the court had established. If they succeeded and obtained a verdict, the plaintiffs could not complain of the error which they had themselves invited, and the defendant's case would be won. If they failed, they would in this way preserve, as they had a right to do, the right of their client to the trial of its case according to the stat-

ute and the established rules of evidence, of which the erroneous ruling had deprived them. One who objects and excepts to an erroneous ruling which permits his opponent to present improper evidence does not waive or lose his objection or exception, or his right to a new trial on account of it, by his subsequent introduction of the same class of evidence in support of his case. Russ v. Railway Co., 112 Mo. 45, 50, 20 S. W. 472, 18 L. R. A. 823; Gardner v. Railway Co., 135 Mo. 90, 98, 36 S. W. 214.

Finally, the defendant had the right, in the first instance, to produce the witness Doremus, to have him sworn, and to examine him orally in support of its defense. It is said that it is generally discretionary with the court to refuse to permit the recall of a witness who has once testified, and that the introduction of Doremus was in reality his recall, because his testimony at the former trial had been read. The truth is, however, that he had never been called at this trial. All that had been done was to read his incompetent testimony at the former trials under the erroneous ruling of the court. Even if it were conceded that the reading of this testimony might have made it discretionary with the trial court to refuse to hear his oral testimony on subjects concerning which he had testified at the former trials, it certainly could not have deprived the city of its right to his evidence on the material questions of the quantity, quality, and reasonable value of the work and materials for which the plaintiffs sued, and concerning which he had not testified at the earlier hearings. There was nothing in the order granting the third trial, nor in the prior rulings of the court, putting the city to its election between the former testimony of this witness and his oral examination, and the refusal to hear his testimony was a fatal error in the trial of this case. The judgment below is reversed, and the case is remanded to the court below, with directions to grant a new trial.