Williams, Judge,
delivered the opinion of the court:
In response to an invitation of the defendant, the plaintiff, on August 18, 1926, submitted its bid for the construe *507 tion of a dam, known as the Stony Gorge Dam, across Stony Creek for the Orland irrigation project about 8 miles west of Fruto, California. It was stated in the invitation for bids that the principal items involved are about 19,000 cubic yards of excavation; about 37,200 cubic yards of concrete; drilling and grouting about 7,000 linear feet of grout holes; bending and placing of about 1,500,000 pounds of reinforcing steel; and installing about 892,000 pounds of valves,, gates, and other metal work. Forty-two separate items of work were enumerated in the invitation, and unit prices were invited for the various classes of work involved.
Prior to advertising for bids the defendant made an investigation of the site for the proposed dam to determine, its suitability therefor, and to decide on the type of dam to be constructed. In making this investigation core-drill test-holes were drilled in the bottom of the creek and test pits.were made in the locations for the dam abutments where solid rock was not exposed. The results of these investigations were made available to bidders through the invitation, for bids, although it was stated that “the accuracy of the interpretation of the facts disclosed by borings or other preliminary investigations is not guaranteed.” Prior to the. invitation for bids the defendant had also prepared detailed, drawings and specifications covering the work to be done-These specifications, together with a circular advertisement inviting bids on the proposed work, were furnished plaintiff. Prior to the submission of its bid plaintiff made a personal investigation at the site of the proposed dam. The plaintiff’s bid was accepted, and on October 2, 1926, the plaintiff and the defendant entered into a formal contract for the construction of the dam. The plaintiff’s bid and the specifications of the work were incorporated in and made a part of the contract.
The contract in general provided that materials entering into the construction of the dam, including cement and structural steel and reinforcing steel, would be furnished by the defendant and that the labor thereon would be performed by the plaintiff. It provided for the performance of 42' separate items of work, which with a single exception would be paid for at unit prices. The concrete to be placed. *508 in the dam appeared under 14 different classifications. The unit prices with respect to the pouring of the concrete varied from $6.00 per cubic yard for upstream and downstream cutoffs and buttress footings to $20.00 for 24-inch circular conduit from 10-inch outlet valve, and the estimated quantities ■.shown varied from 70 cubic yards for “trash rack structure ■floors” and 100 cubic yards for “24-inch circular conduit” to 23,500 cubic yards for “buttresses including tongues and •corbels.”
The plaintiff began operations by the removal of the earth •from the top of the rock and when rock was reached it was ascertained that the rock was of such a character as not to he suitable for the construction of the dam as originally planned. Plaintiff called this fact to the attention of the •engineer, and a board of experts appointed by the defendant visited the site, examined the conditions, and rendered a report in which certain definite and material changes in respect to the construction of the dam were recommended. .’Subsequently, the chief engineer of the Bureau of Keclamation visited the site, made a personal investigation of the ■conditions, and approved the recommendations of the board. The Denver office of the defendant later prepared drawings for the performance of the work in accordance with the modified plans agreed upon by the defendant’s officers, and the work under the contract thereafter was carried on and •completed by plaintiff in accordance therewith. In carrying forward such work differences arose between the plaintiff and the defendant in respect to payment of various items involved. Many of these differences were satisfactorily adjusted. Certain differences, however, were impossible of adjustment and plaintiff upon settlement for the work performed by it under the contract reserved the right to maintain suit on the following items:
1. Out-off wall, $%3ftl(O.Of. — The cut-off wall as contemplated by the original specifications and drawings was to be a vertical keystone-shaped wall of concrete extending across the upstream toe of the dam and which was to form a •connection between the upstream portion of the dam and amderlying rock. Under the original plans this was to be *509 poured into a trench excavated into the solid rock. The sides and bottom of the rock would be irregular and jagged in shape and contour and the concrete being poured into this sort of a trench would become keyed and bonded into the solid rock. The top of the cut-off wall was to have a plane or flat surface about level with the surface of the rock and there was to be a construction joint at the top of this cut-off wall. The face-slab was to fit into this construction joint on top of the cut-off wall and was then to slope upward in a downstream direction at an angle of 45 degrees. Under such plans there would be absolutely no reason for any form work in the construction of the cut-off wall because the concrete was to be poured into the rock trench and the sides and bottom of the trench would form the retaining surfaces for the concrete. The cut-off wall was to be poured as one operation separate from the face slabs and the buttresses. Under the new plan the original cut-off wall was not constructed as a continuous wall but as a separate mass of blocks. The •engineers issued separate plans for the blocks between each pair of buttresses. The cut-off blocks were entirely different in every respect from the cut-off wall originally designed, some of the major differences being as follows: the original cut-off wall was to be poured into a trench in the rock while the new cut-off blocks were not poured into a trench; the original cut-off required no forms while the new cut-off blocks required forms on all sides except the bottom; the reinforcing steel in the new cut-off blocks was different from that in the old cut-off wall; the shape of the cut-off blocks was different from that of the old cut-off wall; the size of the new cut-off blocks was entirely different from that of the old cut-off wall; there was no construction joint on the top of the cut-off blocks, whereas such a joint existed on the top of the cut-off wall; the old cut-off wall was to be poured as a separate operation from the buttresses and face slab, whereas in the new cut-off block part of the face slab and buttresses was poured at the same time; the old cut-off wall was separate from the buttresses and face slab while ■ the new cut-off blocks included a part of the buttresses and .face slab; the cost of constructing the cut-off blocks was *510 greatly increased over what it would have cost to have constructed the cut-off wall.
As the work proceeded in the construction of the cut-off' blocks, the defendant made tentative classifications of the-concrete in these blocks for the purposes of monthly payments, and plaintiff was advised that these were only tentative and a final determination would be made at the end of' the work. Plaintiff protested the tentative payments. At first the Government made a division of the concrete in these-cut-off blocks on a percentage basis, namely, 60 per cent upstream cut-off concrete, 30 per cent buttress concrete, and 10-per cent face slab concrete. The plaintiff continued its protests and about the end of the work the construction engineer-made his final division of the concrete in these blocks along-the lines followed in the tentative payments.
There was no item of the schedule of unit prices which corresponded with the mass of concrete in the cut-off blocks, and therefore the defendant necessarily made its divisions, as to the types of concrete along wholly imaginary lines. No-actual lines existed. Plaintiff protested the division of the-, concrete as made by the construction engineer. This protest, was answered by the Chief Engineer of the Bureau of Reclamation who stated:
Plans for the cutoff blocks were made to include in the same mass of concrete which filled the cutoff trench, portions of the face slab above and the adjoining buttress. In dividing the concrete of the cutoff blocks for payment such portions of face slab and buttress were classed as nearly as practicable in Items Nos. 16 and 13,. respectively, at the corresponding contract prices. The-planes of division are necessarily approximate and in a slight degree arbitrary, but the resulting classification, on the whole is believed to be fair to the contractor.
The Chief Engineer, however, subsequently reconsidered' his decision and made a recomputation of the quantities of the various types of concrete contained in the cut-off blocks, and increased slightly the amounts previously paid plaintiff' for the work, making the total amount paid the sum of .$29,-018.98, which plaintiff accepted under protest, reserving the: right to maintain suit for a larger amount.
*511 Paragraph 50 of the specifications provides:
Bight to change location and flams. — When additional information regarding foundation conditions becomes •available as a result of the excavation work or of further test drilling, it may be found desirable to change the location, alignment, dimensions, or design of the dam, spillway, or appurtenant works, to take advantage of natural conditions. The United States reserves the right to make such reasonable changes as may be considered necessary or desirable, and the contractor shall be entitled to no extra compensation because of such changes, except that any increase in the excavation, concrete, or other work required, will be paid for at the unit prices bid in the schedule. The contractor’s plant shall be laid out to accommodate any reasonable change in the location or design of the dam or spillway or any part thereof without additional cost to the United States.
The substitution of cut-off blocks for the cut-off wall provided for in the original specifications, materially changed both the character and the cost of the work. The cost of the work to plaintiff was materially changed in that plaintiff in constructing the cut-off blocks was required to furnish forms for the pouring of the concrete, which in most part would not have been required in the construction of the cutoff wall. This was not a “reasonable” change, within the meaning of the specifications, which plaintiff was required to make without extra compensation. Salt Lake City v. Smith, 104 Fed. 457; Wood v. Fort Wayne, 119 U. S. 312; Freund v. United States, 260 U. S. 60; Henderson Bridge Company v. McGrath, 134 U. S. 260; Board of Directors, etc., v. Roach, 174 Fed. 949; Drainage District No. 1, etc., v. Rude, 21 Fed. (2d) 257; Six Companies, Inc., v. United States, 85 C. Cls. 687.
Tn Salt Lalce Oity v. Smith, supra, the court said:
* * * The dry words and broad stipulations of contracts must be read and interpreted in the light of reason and of the subject contemplated by the parties. The stipulation common to many corporation contracts, that contractors may be required to perform extra work at the price named in the agreement or fixed by an engineer, is limited by the subject-matter of the contract to such proportionally small amounts of extra work as *512 may become necessary to the completion of the undertaking contemplated by the parties when the contract, was made; and work which does not fall within this-limitation is new and different from that covered by the agreement, and the contractor may recover the reasonable value thereof notwithstanding the contract. The customary provisions in such contracts that the corporation or its engineer may make any necessary or desirable alterations in the work, and that the contractors-shall receive the contract price or a price fixed by the engineer for the work or materials required by the alterations, is limited in the same way, by the intention of the parties when the contract was made, to such modifications of the work described in the contract as do not radically change its nature or its cost. Material quantities of work required by such alteration, that are substantially variant in character and cost from that contemplated by the parties when they made their agreement, constitute new and different work, not governed by the agreement, for which the contractors may recover its reasonable value. Cook Co. v. Harms, 108 Ill. 151, 158, 159; Bridge Co. v. McGrath, 134 U. S. 260, 10 Sup. Ct. 730, 33 L. Ed. 934; City of Elgin v. Joslyn (Ill.Sup.) 26 N. E. 1090, 1092; Sexton v. City of Chicago, 107 Ill. 323, 330; Kirk v. Manufacturing Co., 118 Ill. 567, 8 N. E. 815; Railway Co. v. Vosburgh, 45 Ill. 311, 314; Railroad Co. v. Smith, 75 Ill. 496, 507. The stipulation in such contracts that all questions, differences, or-controversies which may arise between the corporation and the contractor under or in reference to the agreement and the specifications, or the performance or nonperformance of the work to winch they relate, shall be referred to the engineer, and his decision thereof shall be final and conclusive upon both parties, does not give the engineer jurisdiction to determine that work which, is not done under the contract or specifications, and' which is not governed by them, was. performed under-the agreement and is controlled by it, and his decision to that effect is not conclusive upon the parties. Neither an engineer nor a judge who has no jurisdiction of a question can confer jurisdiction of it upon himself by erroneously deciding that he has it.
Paragraph 87 of the specifications provides:
Division, of concrete for payment. — Concrete will be separated for payment into the items named in the-schedule. The division between the various items shall *513 be determined by the engineer. Any small amount of concrete required to be placed which does not come within any of the items named in the schedule shall be-placed in that item to which it most nearly conforms, or if it differs materially from all the items named, it shall be ordered in writing and paid for as extra work, under the terms of paragraph 14 of these specifications..
There was no item in the schedule of unit prices for concrete which corresponds with the mass of concrete in the cut-off blocks. The construction of the blocks was therefore new and different work not governed by the contract, the-reasonable value of which plaintiff, under the authorities cited, may recover.
Paragraph 14 of the specifications provides that work or material ordered by the engineers not covered by the specifications will be classed as extra work and “shall be charged, for at actual necessary cost, as determined by the engineer, plus 15 per cent for profit, superintendence, and general expenses.” While no formal change order was issued by the engineer under this paragraph of the specifications directing-the substitution of the cut-off blocks for the cut-off wall, the construction of the blocks in fact constituted “extra work,”' and plaintiff is entitled to be compensated for the work on that basis.
The plaintiff constructed 48 cut-off blocks containing" 4,073.12 cubic yards of concrete at an actual cost to plaintiff of $45,416.54, which amount includes $12,024.29, the cost of the form work required. A reasonable amount for profit,, superintendence, and general expenses incidental to the work is $6,812.48, making the total compensation plaintiff is entitled to receive for this work $52,229.02. Plaintiff has been paid for the work $29,018.98, leaving a balance due of $23,~ 210.04, which amount plaintiff is entitled to recover on this item of the claim.
2. Buttresses, $20,9$0-$2. — The dam was constructed with 48-buttresses which extended parallel to the bed of the stream and reached from the rock at the bottom to the crest of the dam. The face slab rested on the sloping upstream edge-of these buttresses. The buttresses were of various heights. Those high up on the hillside near the ends of the dam were- *514 lower than the buttresses near the middle of the dam which extended from the crest to the rock in the bed of the stream. The buttresses were all the same thickness at the crest of the dam, and for each 12 feet that they extended downward from the crest of the dam there was an increase in thickness in each succeeding lower portion. Thus, it was provided for in the original contract that each buttress was to be of the same thickness at the same elevation. The original plans and specifications provided that the buttresses should be ■on a concrete footing and that the footing should be poured into a trench cut into the solid rock. No form work would liave been required for the pouring of the footing. This footing was to be a keystone-shaped concrete structure with ■the top flat and level. The footing was to be one and one-half times the thickness of the lower portion of the buttress which rested upon this footing, and there was thus a part of the flat surface of the top of the footing extending on ■each side beyond the lower portion of the buttress which rested upon such footing. The buttresses were to be built •in forms. As originally planned, the bottom of the forms for the buttresses would rest on the smooth, flat surface of the footing. In several instances, the original plans required that there would be a lift of less than twelve feet between the top of the buttress footings and the first regular lift line resulting from lift lines at 12-foot intervals down from the crest of the dam. Under the original plans, these lower sectional lifts would be built in straight-sided form work requiring no unusual work and many of them could be reused, and after the first lift line was reached the standard panel forms could be used on each lift to the crest of the dam. The standard panel forms were built so that they ■could be moved intact from one place to another and thus could be reused many times with a consequent decrease in the cost of form work.
The board of experts, heretofore mentioned, in its report recommended certain changes in the construction of the buttresses, and the Denver Office of the Bureau of Reclamation issued a new general plan concerning the lower portion of the buttresses and from time to time thereafter as the •excavations in the respective places were uncovered the field *515 office issued detailed plans carrying into effect this new general plan as to each buttress. The plaintiff was required by defendant to build the buttresses in accordance with such new plans. For the buttresses as actually built as required by these new plans no buttress footings were constructed. The buttress was rested directly on top of the rock excavation. There was no concrete poured into a trench in the rock. Form work had to be used down to the bottom of the buttresses and to the top of the rock on which the buttress rested. The form work where it met the rock had to be scribed and fitted with great care, accuracy, and expense around the irregular contour and jagged surface of the top of the rock. The entire lower portion of each buttress was. made one and one-half times the thickness of the portion which rested immediately thereon. This lower thickened portion of the buttress was extended upward for a distance of several feet and in many instances past the regular lift lines and thus the special form work extended upward for many feet. The passing of normal lift lines also required the use of many additional sectional forms before the standard panel forms could be used, thus further increasing the cost.
The plaintiff contended that payment should be made for this concrete in the thickened lower portions of the buttress at $10.20 per cubic yard, which was the unit price in the .contract schedule of prices for buttress concrete, and also-contended that since additional special form work was required the increased cost caused by this special form work should be paid to it. The defendant determined that under the contract this concrete in the lower thickened portions of the buttresses should be paid for at $6.00 per cubic-yard, which was the unit schedule price for buttress footing; concrete and that no additional sum should be paid for the-special form work required. The plaintiff protested against this refusal by the Government to pay in accordance with, plaintiff’s demands and accepted the payment of $6.00 per cubic yard under protest and in this suit now claims the difference between the $10.20 per cubic yard and the $6.00 per cubic yard which it has received and also the extra cost of the special form work.
*516 We think the plaintiff is right in the contention that the •concrete involved in this item of the claim should have been paid for as buttress concrete at $10.20 per cubic yard. Buttress footing was entirely eliminated in the new plans and instead the lower portion of the buttresses was thickened and set directly on top of the rock with no footing poured into a trench in the rock. The thickened lower portions of the buttresses had the same reinforcing steel as other portions of the buttresses at the same elevation. They were of the .same mixture of concrete as the rest of the buttresses at the same elevation. They were the same as the lower portion of the buttresses shown on the original specifications, with the exception that they had been thickened and instead of resting on the buttress footing were placed directly on top of the rock. They were in all respects buttress concrete. They were ■not poured into a trench in the rock as was buttress footing •concrete described in the original plans, and they were not in any sense like buttress footing concrete.
The findings show that there were 3,409.94 cubic yards of ■concrete in the thickened lower portions of the buttresses here involved. Plaintiff was paid for this concrete $6.00 per cubic yard, the schedule price for buttress footing concrete. The defendant’s classification of this concrete as buttress footing concrete was arbitrary and erroneous. It should have been classified as buttress concrete and paid for at the rate of $10.20 a cubic yard, the unit price provided in the schedule for buttress concrete. The difference between what plaintiff was paid for the concrete and what it should have been paid under a proper classification of the concrete .amounts to $14,321.75. This amount it is clearly entitled to recover. Plaintiff is also entitled to recover in respect to this item of its claim the sum of $6,618.67, the increased •cost of the special form work over what the cost of the form work would have been had the buttresses been constructed in accordance with the original specifications. Plaintiff is 'therefore entitled to recover on these items the amount ■claimed, $20,940.42.
3. Balance due on conduit concrete and increased cost of ■conduit form work, $1£3%.88. — The specifications provided *517 of a conduit to supply water to a farmer downstream from the dam. The plans showed the location -of the portion of the conduit within the dam and for a short distance below the dam, but the exact location for the conduit below the dam had not been staked out at the time the contract was signed and only general plans were shown for the construction of the conduit. The defendant made certain changes in the location of the conduit and issued revised plans and drawings for its construction in the new location. Some of these changes pertained to the portion of the conduit within the dam and these changes, to the extent they required additional work or cost on the part of the plaintiff over that required under the original plans and ■specifications, have been paid for and are not involved in this suit. On the downstream side of the dam at the point where the conduit emerges from the dam, the location of the ■conduit was changed in the final plans from the north side of buttress 25, as shown in the original plans and specifications, to the south side of buttress 26, a distance of approximately 12 feet. The conduit then proceeded downstream for a distance of approximately 375 feet. The elevation of the conduit and its location were designated with due regard to the contour of the ground and other factors incidental to, and reasonably contemplated by, the original plans and specifications. Plaintiff made the necessary excavation for the conduit, for which it was paid at the unit prices specified under the contract. The trench as excavated varied in width and depth in order to meet the conditions encountered where the conduit was located.
The total quantity of concrete poured by plaintiff in connection with the construction of the conduit was 179.72 cubic yards. Of that amount defendant’s construction engineer classified 161.2 cubic yards under item 18, “Concrete: 24-inch circular conduit with 10-inch outlet valve” and 18.52 cubic yards under item 9, “Concrete: Upstream and downstream cut-off and buttress footings.” The unit price for the former was $20.00 per cubic yard, whereas the latter was $6.00 per cubic yard; that is, a total difference with respect to the 18.52 ■cubic yards of $259.28. The latter quantity was determined *518 by assigning to the latter classification all- concrete which was-poured in the base of the trench and 12 inches below the bottom of the interior bore of the conduit and the concrete above that quantity and surrounding the barrel of the-conduit to the former classification. Payment was made to> plaintiff on the basis of those classifications. Plaintiff contends that this classification of the concrete by the defendant’s engineer was arbitrary and erroneous and that it is entitled to recover $20 per cubic yard for all concrete going into the construction of the conduit, making a balance of $259.28 due.
Paragraph 87 of the specifications provides that the defendant’s engineer shall separate the concrete used in the construction of the dam for the purpose of payment therefor into the items named in the schedule. The evidence does-not justify a finding that the engineer acted arbitrarily or capriciously in dividing the concrete used in the construction of the conduit into the two classifications stated, and in the-absence of such a finding it must be assumed that he acted properly in assigning the 18.52 cubic yards to footing concrete and paying for the same under item 9 of the schedule.
Plaintiff further claims in this item that it is entitled to-recover $1,273.60, alleged increased cost of special form work' over that which would have been required under the original, plans and specifications for the work. The findings show that the greater part of this form work was reasonably contemplated by the original plans and specifications and the evidence is not sufficient to support a finding that the-changed line of the conduit and the taking of the conduit out of the trench and placing it on the top of the ground increased the form work required materially over what it would have been under the original plans and specifications. The plaintiff therefore is not entitled to recover in respect to this item of its claim.
Jp. Closure, $1,099.97. — It was necessary to make provision for the diversion of the water and care of the stream across which the dam was being built during the period of its construction. The original plans and specifications did not show in detail the manner in which the diversion of the stream *519 •should be carried out during the construction of the dam or the manner in which closure of the openings of the dam through which the water had been diverted should be made ■upon its completion. The defendant requested plaintiff to ■furnish plans to close the openings left in the dam during its •construction, and in response thereto plaintiff furnished the •defendant three alternate types of closure. The defendant ■selected one of the types of closure proposed by plaintiff which, with minor modifications was incorporated in the general plans for the construction of the dam and used by plaintiff in carrying out the work. Openings, in the dam for which the closure structures were required were between buttresses 32 and 33, and buttresses 33 and 34. In accordance with the closure plans suggested by the plaintiff and approved by the defendant, the closure structure was built by ■extending the lower portions of these buttresses upstream approximately 15 feet, and carrying out the face slab horizontally to form a. roof or top over these extended portions •of the buttresses, the buttresses thus forming two sides of the openings and the flattened or extended portion of the face slab forming the top. The height of the openings thus formed was approximately 8 feet. Grooves were provided in the extended portions of the buttresses so that when it came, time to close the dam a timber gate was put into the grooves, thus closing off the water while concrete, was poured to make the permanent closure.
Upon the completion of the work the defendant did not require the plaintiff to remove the closure structure, that is, the extended portions of the buttresses and the flattened or -extended portion of the face slab which formed a roof for the opening. The plaintiff contended that these structures therefore form a permanent part of the dam and that it was entitled to payment at the unit prices in the contract for the concrete used in their construction, $363.20 for the face slab •concrete and $395.16 for buttress concrete, together with $47.63 for the placing of 3,664 pounds of reinforcing steel in the concrete. The defendant refused to pay any portion of these sums and contended that plaintiff was obligated by the contract to perform all this work for the lump sum of t$100.00. The defendant is clearly right in this contention.
*520 Paragraph 57 of the specifications provides that—
* * * The cost of furnishing all labor and materials and constructing and removing cofferdams, diverting the river, * * * and all other work required by this paragraph, except the placing of concrete in the diversion openings in the dam, shall be included in the lump-sum bid in the schedule for diversion and care of river during construction and unwatering of the foundations.
The plaintiff made a lump sum bid of $100 for this item of the work. (Item 1, schedule of prices.) The work was performed under plans suggested by plaintiff and approved by the defendant. Whatever the cost of the work to plaintiff' may have been, and it was undoubtedly performed at a considerable loss, plaintiff’s compensation for the work is definitely fixed by the contract at $100.00. Plaintiff has received payment of that amount and is entitled to nothing more. Likewise, for the reasons stated, plaintiff is not entitled to recover the sum of $293.38 on account of reinforcing steel and cement used in these structures which was furnished by the defendant. Plaintiff under the contract was obligated fob the “cost of furnishing all labor and materials” used in the construction and removal of these structures. The defendant, having furnished these materials to plaintiff, was entitled to deduct their value from the amount due plaintiff under the contract. It therefore follows from what has been said that the plaintiff is not entitled to recover in respect to item 4 of its claim.
6. Resurfacing gate slab, $199.68. — The drawings required plaintiff to place upon the upstream face slab of the dam for each of three spillway gates a layer or slab of concrete dy2 inches thick upon which the rubber water-proofing members or sealing strips of the gates would travel while the gates were being lowered or raised. Plaintiff poured the concrete for the gate slab in strict accordance with the specifications, but when the slabs were completed and the concrete had set, it was found that the rubber sealing strips would not operate for the reason that there were certain high spots on the gate slab. The defendant’s construction engineer in charge of the work instructed plaintiff to chip *521 off the high spots and otherwise alter or fix the gate slab' so the strips would operate, the engineer at the time stating-that he would recommend payment for the cost of this work as extra-work. The actual cost of the work to plaintiff was-$199.68. Plaintiff has not been paid for this work. It was: clearly extra work within the meaning of paragraph 13 of the specifications. It was ordered by the engineer in charge of the work and was necessary to complete the work. It.was the duty of the engineer in charge of the work to make’ such payment to plaintiff on account thereof, as was reasonable and proper, as provided in the contract. The plaintiff having performed the extra work, and the defendant, having received the benefit thereof, an implied contract exists on the part of the defendant to pay the reasonable value of the work even though the work was not performed under a written change order as provided in paragraph 14-of the specifications. Plaintiff therefore is entitled to recover on this item $199.68.
6. Balance due because of cost of use of excess cementr $6,377.90. — The contract provided that the Government should furnish the cement, but plaintiff was required to haul it from a distant railroad station to the site of the work, to unload it into storage houses, to handle it in the process of mixing, to then clean and care for the empty cement bags,, to return such bags, and to pay for any loss on the bags. The contract further provided that the concrete should be of such a mixture as to procure certain stated strengths at the end of 28 days and that the mixes should be so designed as-, to not use excess cement. The defendant during the progress; of the work specified the exact mixture of the concrete and the exact amount of cement to be used therein. The work on the dam commenced in November 1926. The defendant in February or March 1928, discovered that a large excess of cement was being used in the concrete and that the concrete-it had been using was greatly in excess of the strength provided by the specifications. When plaintiff learned of this-it protested to being required to use such excess amount of cement. The defendant, however, continued to use the same mixes of concrete throughout the remainder of the work. The Findings show that plaintiff was required to use 93,352: *522 sacks of cement in excess of what it would have been required to use to produce concrete meeting all the requirements of the specifications. Plaintiff, on August 24, 1928, made a written demand for the payment of the cost of handling, hauling, and other operations incident to this excess cement. A more detailed statement and demand was filed by plaintiff on October 31, 1928, setting out an alleged increased cost of $9,858.67. The defendant in response to these demands frankly conceded that an excess amount of cement over that required in the contract had been used and that plaintiff was entitled to receive additional payment as a result thereof. In a letter to plaintiff, November 20, 1928, the defendant stated:
The quantity of cement per cubic yard of concrete used in construction of Stony Gorge Dam was about 12.75% more on the average than the amount contemplated, or more than would have been used in the proportions mentioned in paragraph 67 of the specifications, the excess being calculated at 28,286 sacks. This is considered a change of plans and, as provided in paragraph 18 of the specifications, the contractor is entitled to receive an additional payment on this account, equivalent to the consequent increase in costs.
Plaintiff at this time was allowed the additional sum of $2,634.69 as the cost of handling excess cement, the excess being calculated by the defendant as 28,286 sacks. Plaintiff protested this allowance and on November 1, 1930, submitted an appeal for reconsideration in which a revised computation of its claim was set out showing the excess quantity of cement used was 93,352 sacks. Upon reconsideration of the matter plaintiff’s allowance for the cost of handling the excess cement was increased to $6,588.58, calculated on the basis of the excess use of 74,725 sacks of cement. This amount was paid to plaintiff on final settlement and accepted by it, under protest, with the express reservation of the right to prosecute a claim for the greater amount claimed to be due.
The cost to plaintiff of handling the excess cement used in the construction of the dam, including 15 percent as a reasonable amount for profit, superintendence, and general expenses incident thereto, as provided in paragraph 14 of the specifications, was $12,966.48. The decision of the defend *523 ant’s engineer that the cost of the work was only $6,588.58 was therefore grossly erroneous and was not final or binding -on plaintiff. Plaintiff is entitled to recover $6,377.90 with respect to this item of its claim.
Upon the whole case the plaintiff is entitled to recover the sum of $50,728.04, and judgment will be entered accordingly.
Whaley, Judge; LittletoN, Judge; GeeeN, Judge; and Booth, Chief Justice, concur.